The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good morning, ladies and gentlemen. This is the time for re-hearing on a bank in the case of Doe v. Unocal Corporation. We understand that all counsel are present and ready to proceed. The Court has issued an order asking the parties to, in the course of their argument, to focus on a particular issue, and we hope that we ask the parties to do so. But we are aware that the Court has taken the entire case on bank. And so with that, we will proceed to hear the case. Thank you, Your Honors. May it please the Court, my name is Paul Hoffman. I'm appearing for the appellants in Doe v. Unocal. With me is Terry Collingsworth, who is appearing for the appellants in Roe v. Unocal. Thank you, Your Honor. I'm Terry Collingsworth, and I'm appearing for the appellants in Roe v. Unocal. Thank you, Your Honor. I'm Terry Collingsworth, and I'm appearing for the appellants in Roe v. Unocal. Thank you, Your Honor. And our response to the Court's order is that we believe that federal common law analysis is what should apply to the issue of Unocal's standard of liability for Unocal in this case. We also believe that as part of that analysis that international norms should be used wherever they exist as part of federal common law. We believe the panel majority correctly identified aiding and abetting as being part of international law and therefore should be applied as part of a federal common law analysis. And we agree with the way that the panel has defined aiding and abetting under both international and domestic principles. We also believe that Judge Reinhart was correct in identifying joint venture agency and reckless disregard theories as being enforceable through a federal common law analysis. And one of the problems that occurred in the district court is that the district court did not address many of the theories that we had presented in our papers, in terms of the final decision, and that was rectified to some degree in the way the panel dealt with it, and we certainly assert those theories. Could you, in your remarks, address the difference if there is on the civil side, because the panel and the district court look to criminal international law, and I'm curious as to what the status is if one simply looks to civil law and whether there's any difference between federal common law in the civil side and international law on the civil side. Your Honor, we don't think that there is a difference. I mean, we think that basically – And if there isn't, why would we have to choose between the two? I don't think – I mean, our view is that you could arrive at the same result whether you took what appears to be the panel majority's approach, which is to apply international law directly or apply it indirectly through federal common law using domestic tort principles. But is it important for this Court to declare that in an ATCL case that we must apply federal common law and not international law, or international law and not federal common law? Do we have to do that in this case? I don't know. I mean, in the sense that I don't think you have to in terms of the result. I think the result would be the same. We think that the aiding and abetting – at least on the aiding and abetting question, which is the central bone of contention, I think, the restatement section 876B, which we've always asserted is the proper standard for general tort principles, we think is essentially the same standard as has been elaborated at the international level from Nuremberg on. And I'd also note – well, yeah, so basically we believe that the standard is essentially the same. Now, it may be that there are sub-issues within the definition of aiding and abetting that are not relevant in the facts of this case where there might be some slight difference, but we haven't identified any that would be relevant to the facts in this case. But, Your Honor, the district court analogized to 1983 jurisprudence. And putting aside for the moment the question of whether we applied that analogy correctly, why isn't that body of jurisprudence an appropriate source of law? Well, Your Honor, if you're in a federal common law analysis, I would think that looking to Section 1983 jurisprudence might well be an appropriate body to look to. And I think courts have, in fact, looked to Section 1983 jurisprudence. I think our position, though, is that where there are international standards, those international standards ought to be applied before others. And the reason for that, we think, goes back, I think, to the reason why federal common law should be applied in the first place. The need for not only for uniform national standards, which you could get from looking at Section 1983 or other sources of law, but Section 1350 is a statute that was basically adopted to authorize, to adjudicate the law of nations at a time in particular when the country found that an important element of being a new nation was to show to the world that our courts were available. Mr. Hoffman, I want to see if I understand your answer to Judge Reimer's question. Are you saying that the standard that we apply when you summon a police department in a labor dispute or you summon any law enforcement agency in the United States, your liability for their actions should be the same as when you summon the army of Myanmar and the same principles should apply to the relationship between an American corporation that summons the LAPD and one that summons the army of Myanmar? No. And all my answer was intended to do is say that there might be some appropriate circumstances in which Section 1983 principles might be relevant. I don't think they're relevant there, and as we've strenuously argued, that the Arnold line of cases deals with situations where an ordinary citizen requests police assistance. And there's no ongoing contractual relationship. There's no ongoing exchange of money. There's no ongoing joint cooperation and coordination of security. In fact, we've cited... Let me ask you what concerns me is that I hear one statement that you seek uniformity because we're operating under a uniform federal law. And then on the other hand, you say, but sometimes it would be 1983, sometimes it could be federal common law, and it could be various international, all of which leads me to think that has no predictability or uniformity. So that's my first question. And my second question is I have trouble finding the international standards that you're talking about as related to this case. So maybe you could point me to those. Well, first of all, our position under federal common law is that you would apply international standards first where they exist. There are going to be some issues in the litigation of Alien Tort Claims Act cases that are not going to be susceptible to a rule of decision based on international law because there are lots of decisions like the statute of limitations. I mean, there are a variety of issues that have to be decided. And in those situations, for example, in the Forte case, which was decided before the Torture Victim Protection Act, the court in trying to find the statute of limitations looked to Section 1983 jurisprudence because that seemed like the most appropriate source of law in that analysis to find the statute of limitations. After the Torture Victim Protection Act was passed, there was a congressional mandate in a very similar context for a much longer statute of limitations. And a panel of this court in the Papa case decided that a 10-year statute was appropriate because that was the most analogous statute was the Torture Victim Protection Act, which had the same purposes as the Alien Tort Claims Act. And so what we're saying is that we are, as we believe here it is the case, that there is an international standard on aiding and abetting. And that is derived from what source? First of all, if you go back to the Bradford opinion in 1795, in 1795 Attorney General Bradford said that there would be an Alien Tort Claims Act claim available against either U.S. citizens at the time or the French fleet, if they could find it in the United States, for an attack on a colony in Sierra Leone. And the opinion says that aiding and abetting, it talks about aiding and abetting being part of what could be enforceable and a remedy in a civil suit for a tort committed in violation of the law of nations. Going back to 1795, both the ability to bring that kind of claim against the private party for depredations outside the United States at the behest of a foreign military and for aiding and abetting. Now, to fast forward that, in the Nuremberg cases, there are many cases that talk about aiding and abetting liability in the context of the crimes that the military tribunals in Nuremberg were dealing with. If you go further than that, in the International Court for the former Yugoslavia and Rwanda, the courts there have extensive jurisprudence about the meaning of aiding and abetting. And it's not, I would rush to say that the way that the tribunals for Yugoslavia and Rwanda were set up, they were set up pursuant to Security Council resolutions. The report upon which they were based says explicitly that the norms to be applied by those tribunals were customary. The Security Council itself did not believe that it was a lawmaking authority. It created a remedial mechanism in which international norms would be enforced. And those decisions are not international law themselves. What they are is they're an accumulation of the international jurisprudence that leads one to find the meaning of aiding and abetting. The Rome Statute. But they go a little far afield, don't they? Excuse me? They go a little far afield for having sort of discovered international law that was there all along. They include some stuff that even the author of the majority opinion and the panel opinion couldn't quite accept. Your Honor, the way that international norms are discovered by the courts is for more than one reason. I saw the quotation marks on discovered, as you said. I mean, basically, though, Your Honor, if you look at United States v. Smith, if you look at the Paquete Habana, if you look at all the major international law cases in the 220-some-odd years of the country's existence, the way that courts have found whether something is a norm or not at the international level is to review judicial decisions, is to review conventions, is to review state practice, is to review constitutions of countries around the world. I mean, there's an accepted analysis at the international level. But sometimes they go wrong. Well, I mean, they look at it, they look at the authorities, and lo and behold, they come up with something that's totally off the wall. Which, if you read the standards in Yugoslavia and Rwanda, you would say, whoa. Well, but I think that the debate, certainly what Judge Reinhart took issue with, was the idea of moral support being part of the definition of aiding and abetting. And I would just say two things about that. I think it was a little deeper than that. It was that a tribunal that comes up with a standard that includes moral support maybe isn't such a great authority for us to incorporate into our law, even if it may not be applicable in this case. Once we start going down that road, we don't know what those tribunals are going to come up with. Well, first of all, this Court's not bound by what the tribunal says. You're bound by whether the analysis is. . . It's far more manageable, though, you agree, to rely simply on domestic common law. And you tell us that it doesn't matter in this case. Well, it doesn't matter. We can't tell for sure, despite the three feet of excessive record you all have been kind enough to give us. You know your case better than anybody else. Those are the ins and outs of the case. So if you stand there and say, in my case, it does not make any difference, then sort of hopping back to Justice Fischer's question, is there any reason at all we need to go any farther in this case than to. . . Well, I think that. . . Then let's say as far as the concurring panel opinion went. Well, I think that. . . Any farther than that. I mean, is there any reason to go beyond that? Well, I think one of the problems that we have with the concurrence is that it rejected aiding and abetting as a principle of liability. And we just think that's wrong. I mean, we think that aiding and abetting has been a part of the Alien Tort Claims Act from the beginning, from the first attorney general opinion expressing the view. And it is an international law principle. And there's a core meaning of that principle that the majority came up with, which happens to be the same as, we believe, Section 876B of the Restatement, which means that domestic law and international law are basically the same. But how do you come up with. . . You see, it's one thing to say that aiding and abetting is an international principle. It's another to figure out what would the district judge instruct the jury in terms of the standard for aiding and abetting. So you have the Rome Treaty, which kind of says one thing, and then you have Rwanda, which goes out on a limb with moral support. I'm still having trouble kind of finding the kernel or the core of this international standard that you want us to import into the. . . You say import international into the domestic federal common law. But what source do we use to do that? Because it seems to me that we are lacking a universal standard within aiding and abetting. Well, I guess we disagree with that. I mean, we think the majority did get right what the core meaning of aiding and abetting is. And it took a narrower meaning than some of the international authorities that were presented. There just isn't any doubt that aiding and abetting liability has been used for the most egregious crimes. And what we're talking about here, we're not just talking about a wage and hour claim here. We're talking about a summary execution. We're talking about forced labor. Mr. Hoffman, would you just in kind of general terms explain to me, following up on Judge Kaczynski and Judge McKeown, how you would go about proving your prima facie case? How we would prove our prima facie, factually, in the case? Yeah, just kind of step by step. What do you think you have to show? Well, from our standpoint, we believe we have to show practical assistance or encouragement as an act of duress that has a substantial effect on the crime. To do what? Well, we have to show that, first of all, that there were violations of international law, which we believe are clear in the case in terms of the forced labor and summary execution. And we have to show that knowing that those violations were going on, that UNICAL provided practical encouragement and assistance that had a substantial effect. What does that mean, though, practical encouragement? Well, I think it – Any private business that does business in a repressive country becomes liable on tort? No, absolutely not. Absolutely. We've said from the beginning, that's not the position that we take in the case. So specifically, what kind of encouragement are you talking about? Well, in this case, what we're talking about is the – UNICAL was involved in a joint venture with Total and with the military through MOGI, which is a state-controlled instrumentality, knowing from our view of the evidence that MOGI is just an instrumentality of the generals. They knew going in, they were told by their consultants and everybody else, human rights groups, that Slork used forced labor on a regular basis and was engaged in a reign of terror in that area, that they would bring that. This was not an area where there was fighting at the time. And so what happened was that under our view of the facts, the joint venture hired the military to clear the path of the pipeline, to forcibly relocate the villages that our clients lived in, to build the infrastructure projects for the pipeline, including helipads that UNICAL executives landed in. Can I ask you this because the time is running on us? Assuming that – well, I'll just say it outright. I'm a little uncomfortable with the aiding and abetting standard, as you're arguing it, as perhaps a little far beyond where the established international law consensus has gotten us. If I'm going to stay with, for example, the Nuremberg forced labor cases, if I'm going to stay, for example, with the Flick case and the Krauk case, what's the standard established by those cases, and how does your case fit into that standard for forced labor? I think in the Flick case, I mean, we think it's not that dissimilar. I mean, in Flick basically what happened was that the defendant was aware of the criminal activities of the SS and contributed money to the operation. That wasn't the holding of Flick. They got Flick because Weiss actively solicited increased production of cars with the knowledge and approval of Flick. That's why they got him on forced labor. But the thing is that we think that in the Nuremberg cases, it wasn't required that you had to actively want it. I mean, if you were contributing, and unless you can prove a necessity defense, if you contributed money to that ongoing operation and knowing what was going on, you could be found liable for aiding and abetting it. That's our understanding. If you take all the cases together, that that would be a proper standard of liability under the Nuremberg cases. I asked you at the beginning about civil versus criminal, and you keep reverting back to the criminal standards. Is there a civil standard that you could bring yourself within, as Judge Reinhart suggested, under joint venture or agency? Well, Your Honor, I mean, the restatement of Section 876B is the civil tort standard. You know, we believe that we're able to meet the standards that have been promulgated in the context of criminal law because these are the kinds of norms that tend to be international crimes and involve international criminal liability. I think civil cases often do take, in the ACCA context, take the decisions of international criminal tribunals and apply them in the civil context. Well, in your case, what is it that comes in under encouragement to get you across the line that isn't covered under the traditional American standards for third-party tort liability? What else do you bring in? Well, I've said from the beginning, we think it's essentially the same standard. And, in fact, we even add anything. If we add encouragement, it adds nothing to what we do with the traditional tort standards. I think that's right. And, you know, even the restatement talks about moral support in its comment. And I think what they mean by moral support in that is not a speech-related thing. I think it's a question of ñ I mean, I can think of examples in cases that have come up in ACCA where if, you know ñ But if we didn't add aid in the bed, it wouldn't change your case a bit, I gather. In our particular case? Yes. I mean, we certainly could prevail under the other theories. That's true. But I think that we believe that we also have an ñ I mean, that if you apply 876B as aiding and abetting, which is clearly also consistent with the international authorities, even if they go beyond that, that we should be able to prove the aiding and abetting in this case as well as a theory of liability. And it's an extremely ñ I mean, not having aiding and abetting in alien tort claims that cases, even beyond in this case, would be a disaster. I mean, that's why aiding and abetting has been there from the beginning. Having the ability to go after a third party for these kinds of egregious crimes in a situation where they provided assistance and encouragement that has that substantial impact is very important. Mr. Hoffman, you have about eight minutes left. Yes. I'm going to stop there. Your Honor, given that, I will reserve up until your time. Your Honors, may it please the Court, my name is Randy Oppenheimer, and I would like to respond to the Court's order promulgated to us at the outset, and I think it fits logically into this discussion. I'd like to start with a very fundamental concept, though. I'd like to take one step back and just take one minute to do that, because I think it's very important. I think what we are seeing in this dialogue is some remarkable levels of confusion and fundamental disagreement among principles. I think what we are seeing in operation are very basic issues about, does international law come in to set a standard here at all? Does it come in directly from the international environment? Does it come in in some way through federal common law? Do we ignore all of that and simply apply some traditional rules of federal common law? And I'll address each of those in a second, but I want to suggest that one of the reasons this problem is with us is that the jurisprudence over 1350 has put us in a box, and it comes from the fact that 1350, in fact, does not create a cause of action. The issues that we are struggling with to try to determine what the standards are are, frankly, ultimately issues of international law and a determination of the law of nations that are entrusted under Article I, Section 8, Clause 10 to Congress. And I realize that this is an issue which has been much debated. I realize that there is an argument that if there is no cause of action, this statute makes no sense, and, finally, that it's been with us for some 20 years since Filetiga, and that we should just continue to proceed down this road. But I think it's a mistake. I think it's a mistake that leads us into a situation where we find ourselves asking questions like, do we have a moral support standard that we're importing from international law? And if I may, let me just address it in the following quick way, and then I'll move on to the standards. It is virtually without debate that with this one exception of 1350, the Judiciary Act of 1789 does not create causes of action. It's an architectural statute. It sets the court system for the country, and it did so in this case. When it was originally established in 1789 ---- Mr. Oppenheimer, are you asking us already to revisit the opinion in Alvarez-McChain? Your Honor, I don't know that this was directly addressed in that case, though obviously by implication there was an assumption. There's a statement in Alvarez-McChain to the effect that this is following the jurisprudence of the Ninth Circuit, the Second Circuit, and others, that this is not only jurisdictional but a cause of action. So I guess that puts us back to Judge Tshishima's question. Well, phrased that way then, Your Honor, yes. And what I would request is that we focus on just one element that I don't think heretofore has been raised in this debate that I think is enlightening and important. When the statute was passed, there was one area of international law that was very active and that, in fact, had a rare feature, which is that it provided for tort causes of action between individuals based on torts in international law. And I'm specifically referring to the prize cases. The prize cases were a very active area of jurisprudence when this statute was passed. And, in fact, all of the cases, all of the cases that the plaintiffs cite in response to the government brief are prize cases. And the relevance of that is that Congress had passed a series of statutes, pardon me, a series of treaties with the Netherlands, with Prussia, with France, and with Great Britain that did a rather remarkable thing. In this area, it established a private cause of action by an individual in tort against another individual in circumstances where they had been hurt by the acts of a privateer, by the acts of an agent of the government operating during acts of seizure. And the reason it's significant is that this was one area where the state courts continued to assert some jurisdiction. And it explains, I think, 1350. 1350 was designed to supplement the general grant of admiralty jurisdiction by making it clear that there was concurrent jurisdiction for this one type of tort, which is why the 1350 statute says tort only, to deal with these prize cases. And the only cases that have come down from the statute have dealt with that issue. And I think, Your Honor, if we follow that premise and we go back to the notion that it is Congress that defines the laws of the nations, then Congress would be resolving the issues that we're dealing with. And the best example of that would be the TVPA. Well, let's just assume for talking purposes and also the fact that we have Alvarez Machaín, that there is a cause of action here. The question I have is if you separate slavery from forced labor, do you need state action in connection with forced labor? Because that seems to get tied up with whether we're looking at 1983-type cases or we're going off on some other tangent. And so trying to walk through the normal progression of analysis, maybe you could help us on these questions. Absolutely, Your Honor. If we assume, and you'll appreciate from my perspective of the analysis, this is a little bit of an artificial exercise. But if we assume that there is a cause of action, then I think we go nowhere near aiding and abetting for a number of reasons. For one thing, there is no international aiding and abetting standard for civil actions. It just doesn't exist. There are a whole variety of conflicting and varied standards that have emerged over the years for aiding and abetting in the international environment in the criminal side. But there is absolutely nothing that deals with civil liability. The aiding and abetting standards that have been reported through the decisions in this case so far are remarkably inconsistent. They partake of different standards. Some require knowledge. Some require intent. The most recent articulation is probably the Rome Statute. The Rome Statute has an intent requirement, has a knowledge requirement. The United States, parenthetically, has not ratified. So we are dealing in virtually all of these cases with standards that exist independent of an American imprimatur. Counsel, what would be wrong, though, with using a joint venture kind of an analogy that would seem to meet the requirements of 1983? It would seem to meet the requirements of international law. It would seem to meet any of these requirements to say that if someone consciously enters into a joint venture specifically to accomplish a violation of international law or knowing and approving that it will encompass a violation of international law, why would that be insufficient if it were in your view? Your Honor, in fact, that's where I would go. If we're going to treat 1350 as having a cause of action, then I think that the concurrence in the vacated panel opinion has many aspects which are commendable. Again, with my initial premise that ultimately I think we could avoid having to go down this road in the first instance. But one of the things that the federal common law, at least as articulated by the concurrence, has going for it, is that it has notions of control in almost each one of the categories that were identified, joint venture, agency, and depending upon how it is interpreted, reckless disregard. And the significance of that, I think, is that that is a related concept to the concept we see in operation in the 1983 cases. I would note that the 1983 cases are a part of, and the jurisprudence there are a part of the federal common law as well, as well as being statutory, that the benefit of looking at that type of analysis is at least threefold. One, we stay out of an international arena where the only standards we have to work with are aiding and abetting from the criminal side with a whole slew of conflicting interpretations, some of them quite aggressive. We have the benefit of 1983 jurisprudence, and whether we treat it as directly applicable or as a matter of guidance, it seems to me it is the right body of law to look at. It is highly instructive. And I say that because we are dealing here with a relationship between a private actor and a government entity. And the 1983 jurisprudence has struggled with that problem, with that concept, has set some guidelines for how we go about analyzing that relationship. It's a unique one. And one of the features I believe that's important from those cases is that they require that there be an element of control for proximate cause, and they require that there be a relationship between the government and the actor that would justify holding the private actor. But there are cases in the context of a democratic government where the people control the police department, the police department is law-abiding, that you assume a relationship between the state and the private entity that you don't assume in a country where the army, where you assume the plaintiff's case is engaged in wholesale human rights violations. Isn't the law really developed in a wholly different context than the 1983 law? Your Honor, I would agree, thankfully, that it grows up in this country where, as a general matter, we do have those confidences in our government and our police. But on reflection, I think the answer is that the 1983 cases actually deal with those situations where our government officials or our police are misbehaving and, in fact, are acting to deprive people of their civil rights. And I think that more than a presumption that the police will behave properly, guiding 1983, is a deeper issue, which is that in most situations, and I believe ultimately in this case as well, private actors do not control state actors. And when we hold private actors responsible for state actors, we're embarking upon an unusual operation and some rules have grown up that I think prudentially focus us on the elements of control and proximate cause that would make it acceptable in certain cases to hold a private actor responsible for a state actor. And so I believe that's what drives that jurisprudence. If we can return for a moment to international law, would you agree that the Nuremberg forced labor cases articulate a now-established norm of international law? No, Your Honor. I'm thinking, of course, in particular of the Flick case and I'll call it the Crouch case, but it's the Farben case involving Crouch. And why not? I guess I should qualify my answer initially. The Nuremberg cases are emblematic. You're referencing the forced labor aspect of the Nuremberg cases. Understood, Your Honor. And preliminarily let me say that I think it's clear when you look at the three driving cases under the Nuremberg standard that you have active participation in the use of what was in fact slave labor in each of those cases. But I think the important point from an international law doctrinal point of view is that the Nuremberg tribunals represent one of the rare types of cases where private actors under international law are held accountable. Those cases make very clear when you go back to Council Order No. 10 and the International Military Tribunal that what the four powers were doing were dealing with war crimes and with genocide. And they were analyzing those issues and slavery in those contexts. So it is a unique situation under international law. There are very few circumstances. I'm not sure I understood your answer. Are you telling me that it is not an established norm of international law that a private party violates a norm if that private party enslaves someone? No, Your Honor. I would agree that slavery properly understood as opposed to temporary conscripted labor, but slavery is one of those rare types of norms that would be used cogent, for example. So the question then would be is this forced labor slavery or forbidden forced labor? And then the question would be is UNICAL sufficiently involved in, knowledgeable of, and approving of that forced labor that it can be held accountable? That's the question. I would break my answer into two parts. The first part is that I don't believe the Nuremberg Tribunals and specifically the Flip case can be understood apart from the war crimes and genocide features and the active participation. They do not, in my opinion, as I read them, implicate aiding and abetting at all. They implicate direct participation. I did not use the word aiding and abetting. In that sense, yes. Because what they involve is a direct participation in the act of slavery and its attendant to war crimes. And so in that context, that is correct. So I think your answer then is that they do state an established norm. We may quarrel as to how that's articulated, but there is an established norm there. Yes, although I think for a variety of reasons it's inapplicable to this case. I understand. If we were operating under civil standards, you said that you would adopt the concurrence of Judge Reinhart with some qualifications apparently. But if we were looking strictly to civil standards and not criminal, what would you be looking to for your joint venture analysis? What would be the source of law? Well, I think what I would focus on in the concurrence, in fact, is that the discussion there, at least as I read it, is primarily with respect to rules of civil liability that derive from relationships, joint venture, agency, and reckless disregard is, I think, a more complicated issue. But each of those claims is a civil claim. Right. And would that come from federal common law, as Judge Reinhart suggested, or would there be any role in that analysis for principles of international law that address the same subject? Your Honor, I believe that it would come from federal common law. I do not see in this context any particularly significant role for international law in the following respect. International law, by and large, with these very few exceptions, does not deal with the relationship of individuals with each other. It deals with the relationship of states with each other. The exceptions are very narrow. And as a result, there really is, in my view, no international jurisprudence of the type that is addressed in the concurrence. The rules that deal with responsibility and control are simply not present in the international environment, which is fundamentally dealing with criminal matters and with, unless it's a treaty issue, and with matters of state-to-state relationships. That brings me back to the question, then, if Nuremberg and Flick are not applicable, in your view, because of their time-related and genocide- and war-related foundation, is there a place you can look in international law as to forced labor to determine whether it is limited to a state-to-state relationship or whether private actors are looped in? Because that, then, it seems to me that's a predicate before you would ever get to whether there is third-party liability. Your Honor, I would answer that in the following way. There is predicate law in the international environment for dealing with individuals in the context of slavery. I think a fair interpretation of the international standards, and they're quite varied, on temporary conscripted labor show that that is not slavery. And the result of that determination is, first, it is not clear at all that it even constitutes an international law violation. The whole issue of conscripted labor is a highly debated one. It is the subject of differing interpretations, but temporary conscripted labor, generally speaking, is not slavery. So it does not subject an individual to international law prescription. The individual is not engaged. It requires state action if it's a crime at all. But you start out in this case with the assumption that it is state action. And the question is, is the individual to be held liable for the state action? So I don't really understand the distinction you're drawing where you say state action is required. I thought that was a given here because the theory is either under their theory they aided and abetted the state action or under another theory that you're liable as a third party derivatively for the state action. But in either case, there is state action involved in the forced labor. Your Honor, I was responding to the question whether the individual would be liable for temporary conscripted labor. Yes, for the state action. Well, for the conduct at all under international law. I understand that the alternative description of liability would be based upon federal common law establishing vicarious liability for the acts of the admitted state actor. I thought you were distinguishing between cases in where you can sue the private individual for a violation and those in which you need state action. And I said it seems to me that distinction doesn't apply in this case because they're not suing the private individuals directly for their action. The forced labor, in theory, is accomplished by the government. And the question is can a third party be liable for that governmental action? And understood, Your Honor. I believe the doctrinal response is aiding and abetting is not a vicarious theory. It is a direct liability theory. And that, I believe, we've addressed internationally. I guess I'm wrong. I thought you were saying that there are some acts that are use Kogans, for instance, for which a private individual can be held liable, others for which only a government. You need governmental action. That would be a relevant distinction in a case where you were suing a private individual for doing something directly. But is that distinction of any relevance? Where you're suing the private individual for an act committed by the government. It's a little bit tautological, but my answer is not if you're not seeking to hold them directly liable. No, of course you're not directly liable. You're holding them liable for the act of the government. That's correct. And, therefore, if your theories are only vicarious. Right. So putting aside aiding and abetting and only vicarious, then the state action is basically subsumed. I mean, you have state action. Well, my view would be if you seek to impose aiding and abetting liability, which is a direct liability, then you would have to go through the state action analysis. Then you'd have to go through the state action analysis. But on a vicarious liability theory, that falls out. It does, but I have a very – yes, in theory it does. I have a very important caveat to that, which is my belief that there is fraction, if you will, under the federal common law is based importantly on the notions of control and proximate cause that have grown up in the 1983 jurisprudence because I think it provides important protections to individuals who are being charged with controlling state actors. And I think this is a case which really shows how critically important that analysis can be. I believe that as described in the concurrence to date, that the articulation of the traditional tort theories as well share some of those important characteristics requiring that there be a showing of control so that responsibility is not untethered from – But if you're saying – let's take this under a joint venture analysis. Let's suppose UNICAL knew full well that there was going to be what you euphemistically call temporary conscripted labor. And they knew it, and they knew that was part of the project. But they could not control the Myanmar military because obviously they couldn't. Are you saying because they couldn't control it, even though they fully invested in this program, knowing that that was going to be the source of labor, there would be no liability because there was no control? Possibly, Your Honor. I mean, the analysis under 1983 would require two steps. It would require a determination of the relationship between the parties and then whether there was any proximate cause. The second step would definitely require a control determination. And this case, I believe on the record, may be an example of one part of what you're saying. I believe that it is clear. I do not think it's contested that whether UNICAL had made this investment or not, this project would have proceeded. So we have a situation here. Now, again, I want to be very clear because I think it's important to the men and women who work at my client and because I believe it's consistent with the record. I'm just engaging you hypothetically. I was posing it as a hypothetical. I'm testing your control theory, not so much the facts of this particular case. Understood. I believe that if an investment is made in an environment in which there is no ability to control and the relationship would otherwise not have risen to the level of liability under the 1983 jurisprudence, that you don't have liability in that situation. I was concerned about that because I was with you until you got to that point, and it seems to me basically you've now endorsed the blind eye theory, which is you can walk all the way to the water and then when the other guy pushes him in, as long as you're not looking, you're okay. Well, no, I would say that that's actually not true in a couple of respects. One is if there is a cognizable relationship between the parties that would cause there to be vicarious liability, then you would be vicariously liable. But I guess the circumstance where you have a truly passive environment raises the issue that Your Honor has pointed out. I would also point out that there is in the Fourth Circuit in Austin against Paramount Parks, which was recently decided, there is a situation where the local police basically consigned some of their policemen to a park and they were largely under the control of the local police authorities, but the park had in effect hired them, so they had that relationship. The Fourth Circuit's analysis required them to go through a 1983 type analysis, notwithstanding that they had an employer-employee relationship. So one caveat to this jurisprudence is I don't think you can take tort concepts that don't embody some form of control or involvement with the entity that's actually acting. So, for example, not to put too fine a point on it, but responding at superior under 1983 is unavailable. You don't have that option, and recently that was also applied to individuals. So you have to have more than just a bare relationship. But the types of relationships that are identified thus far in the case under joint venture and agency have those elements of control that I think tether the responsibility and the control together. One of the things that I think is important in this area is the fact that in the cases that have imposed liability on private actors for government conduct, there's either been active participation or a very distinctive relationship in which the private party has the ability to influence the outcome of the conduct. I also think we have some other bases for taking advantage of the notion of federal common law in this area. Again, and I appreciate it, I won't say this again, but for me this is a little bit artificial, because I do think we could circumvent this if we treated 1350 as not creating the cause of action. But in Meyer v. Hawley, we had a situation where the Supreme Court, I believe, endorsed resort to federal common law principles in a circumstance in which a statute created a tort liability. So I think there is precedent for this approach. And the Supreme Court jurisprudence, I think, also cautions strongly against trying to find some sort of aiding and abetting liability on the other side of the equation. And obviously the example we cite, and I think it hits the nail on the head, is Central Bank. You do not imply an aiding and abetting liability standard in a statute that provides for money damages unless it's clear on the face of the statute. And you don't import, and the Supreme Court actually deals with this in Central Bank dead on, I think, you do not import from the criminal environment into the civil environment. The criminal environment has various different forms of aiding and abetting. And the fact that it is there, indeed, the Supreme Court in Central Bank said the law of aiding and abetting under the criminal rules has been around since almost the beginning of the country. It's statutory. There's a general aiding and abetting criminal statute. But we're not going to pull it into 10B because it's not on the face of the statute, and strongly counsels against doing that. If the theory here is that 1350 is basically a court statute that Congress passed, then it seems to me the rule applies here. And so that is another reason under Central Bank why you would not want to go after an aiding and abetting standard because the Supreme Court didn't do it under 10B, and for the same reasons one wouldn't want to do it here. Interestingly, there's another parallel, I think, between Central Bank and this case. The jurisprudence in the Ninth Circuit has grown up to limit the types of international law rules that would ever be considered a jurisdictional trigger for the statute. They have to be specific, universal, obligatory under Marcus II. The Supreme Court in Central Bank, I think, makes the good point that in the securities area you need specificity. The similarities are striking, it seems to me. So I would argue that what Central Bank teaches in conjunction with Meyer against Hawley is that where you have a tort statute, a statute for money damages, it's a federal statute, you can't, unless it's clear on the face of the statute, import aiding and abetting liability in the civil context. You can look to federal common law. I believe that's the teaching of those cases combined. In closing, I think we see in virtually all of the international law standards that have been proposed for aiding and abetting a tremendous diversity of different approaches, different rules. We see doctrinally that there are rules such as Central Bank against importing aiding and abetting liability into the civil context. And we see that we have an alternative properly understood under the federal common law and that the benefit of the latter is that it allows us to do something that I think is of fundamental importance in an area where you're looking at the liability of private individuals for governments, which is do they have some ability meaningfully to affect the results and the circumstances. Thank you, Your Honor. Good morning, Your Honors. I'm Terry Collinsworth. In our remaining time, I'd like to address a couple of the questions raised and then try to fit this all together in a way that makes sense. First of all, I think it's extremely important to note that in your opinions in Marcos and in Alvarez and in both of the opinions in the original panel decision in this case, the judges have all said the same thing about international law, that it is part of the federal common law. And all the cases go back and cite Paget-Habana, which says that it is well settled that the law of nations is part of the federal common law. That seems to me a given. Now, I think conceptually the way to look at this is very similar to the situation we have in other areas, such as Section 301 of the Labor Management Relations Act and the Lincoln Mills line of cases. You cannot, first of all, read the law of nations out of this. We say that it's part of federal common law, but nonetheless the statute explicitly uses the term the law of nations. That has to mean something. And in the Torture Victims Protection Act, which this court relied upon in the Hillel v. Marcos case to adopt the command responsibility doctrine, well, the Torture Victims Protection Act also specifically references aiding and abetting liability. And we think that that is grounding it in federal law and that it shows that it's consistent with principles that we can operate with. But again, under Section 301 in the Lincoln Mills line of cases, even there the courts are charged with developing a federal common law. That's explicitly the charge. And the courts have consistently applied state law principles if they aren't inconsistent with federal law. And I think that's the kind of relationship we need here. Now, it's not there yet because every single case that I've looked at, the federal principle and the international principle were essentially the same, as we say they are here. The only time courts have really analyzed any differences, in an opinion at least, is the law of damages. And there this court in Alvarez and in several other opinions searched around to find something that would effectuate the remedial purposes of the Alien Tort Claims Act. Well, that's what the courts do consistently in Section 301 as well. And in this court, the decision of Rose transfers versus local freight drivers, 850 F. Second, 1351. Applying Section 301, the court applied tort-like remedies to a contract dispute because it was charged with applying federal common law. Counsel, in your view then, how would the aiding and abetting analysis flow under the federal common law rubric? Well, thank you, Your Honor. The fact is that it is part of federal common law and the common law. What I think is, if you look at 876B of the restatement, which has a provision that says if you knowingly provide assistance, and if you look at the Halverson versus Welch case, which we cite in our briefs, it's 705 F. Second, 472, 478. Those are hooks for a federal common law of aiding and abetting. And I would say that unless there's a conflict with those federal principles and the international principle, then there is no reason to analyze it further, that that is the principle. If there is a specific conflict, then I think that's why you want this grounded in federal common law so that it's rooted in something and we don't get too far afield of concepts that we can develop here. And that seems to be the major concern, that we don't want to just pick and choose international standards that we can't ground in federal common law. But in this case, the grounding exists because of the restatement, the Halverson case, and the reference in the Torture Victims Protection Act to aiding and abetting liability. I think, though, in the very limited time, I want to conclude by emphasizing where this case is now, that this was a grant of summary judgment against the plaintiffs. And the district court said there was no evidence to show that there was participation, no evidence of control, and the court applied the Nuremberg principles but applied the necessity defense in such a way as to exonerate anyone who did not have a gun to their head in making a decision to go forward. This case is consistent with the Nuremberg principles and the common law aiding and abetting. But we meet any standard that has been discussed here today. I think that it's very important to take two minutes and look through some of the facts, that going into this project, UNICAL was warned by its internal consultants that doing business with the military would ensure that they would be engaged in forced labor. In May 1992, before the project even started, control risks, the firm they hired, told them that the potential profits would need to be unusually high to justify the high political risks involved in expanding the company's operations in Burma. There were public sources of information available at this time, human rights reports, State Department reports, essentially saying that forced labor and slavery and human rights violations were indefinite. Where does all this lead you? I mean, let's say a company decides to buy grain or some raw material, diamonds, knowing from all these sources that the stuff is grown or mined or felled, or however they get it, by use of slave labor in the country. So what they do is they send ships into the harbors, and when paying hard currency, the ships are loaded up with this stuff. And they have every reason to believe that everybody involved in the production, transportation, loading of that stuff is a slave. That would result in liability, wouldn't it, under your theory? Actually, Your Honor, no. That is a much different case. I'm not necessarily— How is it different? How is it different? They know this is going on. They know that if they pay the money, the money will go to people who are supporting, and they help. And the only reason enterprise happens is because they are buyers. Presumably they would not engage in slave labor if there wasn't somebody out there buying the stuff, right? Well, I think it would depend, Your Honor, on whether it was a one-shot deal or there was a long, ongoing relationship that then provided— Take your pick. Okay, I'll take the latter then, that I think if it was a one-shot deal, I don't believe that you would have the knowing assistance, substantial assistance prong met, evading and abetting. Really? Not even for purposes of summary judgment? You know, you say, well, you know, it's a big deal. You know, you have one contract. It involves 7 billion tons of the stuff. It takes months to load up. I mean, you know, how— Well, if you— What do you mean one deal? You never buy just one tree or one metric ton of the stuff. If you wanted to draw the line there, I certainly would not quarrel with that. That would be a helpful development— Well, the question is how do you draw the line there? You know— Because you need substantial— It seems to me what you're proposing has no limits at all. If I'm sitting at home using this stuff, you know, the tennis shoes or whatever, and I know that ultimately this stuff is produced by slave labor, then maybe I'm liable too. Your Honor, I see my time is up. Can I answer the question? The substantial assistance component is not absolutely crystal clear. But here we have a situation where UNICAL hired the military. We have evidence in the record at ER 1863, their contract with the military. They characterized the contract as, according to our contract, the government of Myanmar is protecting the pipeline. Now, from that point on, given the knowledge that I've already described, that they knew there was forced labor, they then went into this arrangement. They provided logistical support. They provided material support, vehicles. They provided assistance to them in terms of the design of the overall pipeline. They assigned the military to go out every day. And this went on for seven years. I think we understand the nature of your question. Okay. Thank you very much, Your Honor. Thank you, counsel. The case is argued. Thank you.
judges: Schroeder, Reinhardt, Kozinski, Rymer, Tg. Nelson, Tashima, Graber, McKeown, W. Fletcher, Fisher, Rawlinson